Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000962
28-JAN-2014
11:09 AM

NO. CAAP-12-0000962

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee, v.
LETITIA HARTER, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 11-1-1063)

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, Fujise and Leonard, JJ.)

Defendant-Appellant Letitia Harter (**Harter**) appeals from an October 11, 2012 Judgment of Conviction and Sentence entered by the Circuit Court of the First Circuit (**Circuit Court**).[1]

After a jury trial, the Circuit Court convicted Harter on one count each of: (1) assault against a law enforcement officer in the second degree in violation of Hawaii Revised Statutes (**HRS**) § 707-712.6 (Supp. 2012); (2) resisting arrest in violation of HRS § 710-1026(1)(a) (1993 & Supp. 2012); and (3) disorderly conduct in violation of HRS § 711-1101(1)(c) (1993 & Supp. 2012).

On appeal, Harter contends that: (1) the Circuit Court abused its discretion in denying Harter's motion for withdrawal and substitution of counsel; (2) the Circuit Court abused its discretion in failing to hold, *sua sponte*, a hearing to determine Harter's competence to stand trial; and (3) Harter was not afforded effective assistance of trial counsel for counsel's

---

[1] The Honorable Edward H. Kubo, Jr., presiding.

failure to object, based upon lack of foundation, to an officer's testimony that Harter was on drugs.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, as well as the relevant rules, statutes, and case law, we resolve Harter's points of error as follows:

(1) Although a criminal defendant has a constitutional right to effective assistance of counsel, it is not absolute. State v. Torres, 54 Haw. 502, 504, 510 P.2d 494, 496 (1973) (citations omitted). "[C]ertain restraints must be put on the reassignment of counsel lest the right be manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." State v. Soares, 81 Hawai'i 332, 354, 916 P.2d 1233, 1255 (App. 1996) (citation and internal quotation marks omitted), overruled on other grounds by State v. Janto, 92 Hawai'i 19, 986 P.2d 306 (1999). Thus, a trial court's decision will only be overturned on appeal if "there was an abuse of discretion that prejudiced the defendant by amounting to an unconstitutional denial of the right to effective assistance of counsel." Torres, 54 Haw. at 505, 510 P.2d at 496. This court looks to whether the Circuit Court protected Harter's right to effective representation of counsel by conducting a "penetrating and comprehensive examination" that was "sufficient to enable the court to determine if there is good cause to warrant substitution of counsel." State v. Kossman, 101 Hawai'i 112, 119, 63 P.3d 420, 427 (App. 2003) (citation omitted). In assessing whether there was good cause, the Circuit Court may not simply consider the defendant's subjective perception but must apply an objective standard. Id. at 120, 63 P.3d at 428.

Here, the Circuit Court thoroughly examined the basis for Harter's request, counsel's readiness for trial, and other facts and circumstances, including that the request was made on the eve of trial, a month after defense counsel confirmed her readiness to proceed to trial. The court engaged in an in-depth dialogue with both Harter and her appointed counsel about

2

Harter's complaints about an insufficient number of in-person meetings[2] and counsel's purported failure to return phone calls, counsel's ability to effectively represent Harter, and whether Harter and her counsel could engage in effective communication in aid of her defense. Based on the record of this case, we conclude that the Circuit Court did not abuse its discretion in determining there was not good cause to warrant a (further) substitution of counsel in order to protect Harter's right to effective representation of counsel.

(2) Harter argues that the Circuit Court abused its discretion in failing to hold, *sua sponte*, a hearing to determine Harter's competence to stand trial.

The Hawai'i Supreme Court has long held that, pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, "it is the duty of the trial court to order *sua sponte* a hearing on competency when what is before it sufficiently indicates that the defendant may be incompetent to stand trial." State v. Tyrrell, 60 Haw. 17, 22, 586 P.2d 1028, 1032 (1978) (citation omitted). In State v. Castro, 93 Hawai'i 454, 461, 5 P.3d 444, 452 (App. 2000) (Acoba, J., concurring) (**Castro I**), in a concurrence subsequently approved and adopted in its entirety by the supreme court in State v. Castro, 93 Hawai'i 424, 427, 5 P.3d 414, 417 (2000) (**Castro III**),[3] Judge Acoba emphasized that physical and mental competence at the time of trial are central to the due process of law. See also State v. Tierney, 127 Hawai'i 157, 171, 277 P.3d 251, 266 (2012) (citing Castro I). The statutory criteria applicable to determining incompetence is set forth in HRS § 704-403 (1993):

> No person who as a result of a physical or mental disease, disorder, or defect lacks capacity to understand the proceedings against the person or to assist in the person's

---

[2]    Defense counsel confirmed that, with the exception of courthouse discussions at the time of appearances (and telephone discussions), she and Harter had only a single in-person meeting, which lasted approximately one hour.

[3]    Castro II was a memorandum opinion of the Intermediate Court of Appeals that post-dated Castro I and pre-dated Castro III. See Castro III, 93 Hawai'i at 425, 5 P.3d at 415.

own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures.

Pursuant to HRS § 704-404 (Supp. 2012), "[w]henever . . . there is . . . reason to doubt the defendant's fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution" and order an examination and report upon the defendant's physical and mental condition. As explained by Judge Acoba in Castro I:

> While the term "may" suggests that discretion inheres in the trial court as to whether to appoint examiners, the balance of the pertinent statutory language suggests that only some rational basis for convening a panel is necessary to trigger the court's appointive power. Absolutely no burden of proof is placed upon the defendant in requesting a panel evaluation. The filing of a notice aside, what would seem to be the most minimal of standards—that there is "reason" to doubt fitness, or to believe that the defendant's physical or mental responsibility will or has become an issue in the case—invokes the exercise of the court's discretion. Hence, the court is duty bound to *sua sponte* convene such a hearing if it itself has or is presented with rational basis for believing that the physical or mental defect of a defendant will become an issue on the question of fitness or responsibility.

93 Hawai'i at 462, 5 P.3d at 452.

In State v. Janto, 92 Hawai'i 19, 29, 986 P.2d 306, 316 (1999), the supreme court held that "the trial court's determination that a defendant is competent to stand trial will be reviewed under an abuse of discretion standard." In this case, however, the question of Harter's competency to stand trial was never raised in the trial court and, therefore, was not addressed. Cf. State v. Soares, 81 Hawai'i 332, 916 P.2d 1233 (1996)[4] (defendant filed a notice of intent to rely on mental defense and request for order appointing medical examiners); Janto, 92 Hawai'i at 24, 986 P.2d at 311 (defendant filed motion for appointment of examiners to determine fitness to proceed and penal responsibility).

---

[4] Soares was overruled in part by Janto with respect to the applicable appellate standard of review. Janto, 92 Hawai'i at 29, 986 P.2d at 316.

Hawai'i Rules of Penal Procedure (**HRPP**) Rule 52(b) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The appellate court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." State v. Nichols, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006) (quoting State v. Sawyer, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998)); see also, e.g., United States v. Marks, 530 F.3d 799, 814 (9th Cir. 2008) ("we review a [trial] court's decision not to *sua sponte* order a competency hearing for plain error").

The United States Supreme Court has described the right not to stand trial while incompetent as a fundamental right and emphasized "[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." Cooper v. Oklahoma, 517 U.S. 348, 354 (1996) (citations and internal quotation marks omitted). The Court has further noted "the right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination." Id. at 354 n.4 (citation omitted).

We conduct our plain error review in this context. In addition, we are particularly cognizant of the fact that no determination of Harter's competency was made by the Circuit Court and, if such determination had been made, it would have been subject to an abuse of discretion review of the trial court's assessment of the expert testimony and the court's observations of the defendant. Janto, 92 Hawai'i at 29, 985 P.2d at 316 (overruling Soares).

Although in Janto the supreme court rejected the standard of review adopted by this court in Soares, some of the competency-related observations of the Soares court would appear to have continued vitality in evaluating the Castro I analysis, i.e., whether the Circuit Court had "reason to doubt [Harter's] fitness, or to believe that [her] physical or mental responsibility will or has become an issue," thus "forming a rational basis" for believing that a mental defect would become an issue, and triggering the trial court's duty to sua sponte convene a fitness examination and hearing. Castro I, 93 Hawai'i at 462, 5 P.3d at 452.

The Soares court observed:

> The fact that a defendant has been diagnosed as mentally ill or emotionally unstable to some degree does not necessarily mean that the defendant is incompetent to stand trial. . . . Similarly, a defendant's agitated behavior or verbose, rambling, and inappropriate remarks at trial do not automatically raise doubts as to the defendant's competence to stand trial.

Soares, 81 Hawai'i at 350, 916 P.2d at 1251 (citations omitted).

Under similar circumstances, where the issue of competency was raised for the first time on appeal, the Ninth Circuit Court of Appeals has described the appellate court's task as consideration of whether "the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant's competence. . . . Among the factors we consider to determine whether there was sufficient evidence of incompetence are the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his [or her] competence." Marks, 530 F.3d at 814 (citations and internal quotation marks omitted).

A significant issue in this case is the lack of any (known) prior medical opinions concerning Harter's mental health. In addition, Harter's counsel, who was in the best position to observe Harter's ability to participate in her defense, did not raise any concerns about Harter's competence. See Castro I, 93 Hawai'i at 462, 5 P.3d at 452 ("Judges must depend to some extent on counsel to bring questions of fitness to stand trial to the

6

court's attention.") (citation and internal quotation marks omitted). On this appeal, Harter relies on numerous statements that she made in the course of the trial proceedings.

At a trial call held on January 23, 2012, Deputy Public Defender (**DPD**) Beau Bassett (**Bassett**), who appears to have been Harter's second DPD, orally moved to withdraw as counsel. In support of this motion, Harter stated to the court:

> There was a conflict of interest, and I've tried to hire another attorney. He told me I have to ask you first if there's a court-appointed attorney outside of the public defender's office that's free. Because [Bassett is] the seventh public defender, and I tried to set up an interview and I've tried and tried. And then finally when I did, I was telling him that I have a new job as an MTV assistant casting director, and he said, You're crazy. And I was like, Excuse me? Like, every single thing I've said he tried to put me down about.

The motion was granted and thereafter a private attorney, Te-Hina Ickes (**Ickes**), was appointed as Harter's counsel. After various additional trial calls, on August 13, 2012, which was the final trial call and the eve of the trial, Ickes appeared on behalf Harter and made an oral motion to withdraw as counsel. That hearing on Ickes's oral motion to withdraw included, *inter alia*, the following exchanges:

> MS. ICKES: Also, Judge, just -- just to keep the record clear or just to make my record, I believe that if the Court -- and I understand the Court's inclination. We discussed it. If the Court is inclined not to grant this motion, another reason I think it might impede Ms. Harter's right to a fair trial is that there's that communication breakdown between the two of us. She doesn't -- I believe that she no longer trusts me, you know.
>
> The defendant has a right to testify in his or her own defense. It's really going to impede my ability to prepare her or advise her regarding her potential or her rights to testify in her own defense and not testify -- or not testify, my ability to actually sit down with her and prepare her for potential cross-examination. I -- I think that would infringe on her right to a fair trial, her right to testify on her own behalf if -- if she doesn't trust me, and at this point I believe that she -- the -- that's -- that's key and that's how she feels.
>
> . . . .
>
> THE COURT: Ma'am, I will hear from you now. You may stand and address the Court.
>
> DEFENDANT HARTER: Yeah. I've only had one meeting with her, and every month multiple times a month I've asked to schedule another meeting just to know what's been going on with my case, if anything. Because before we

had nothing, and I file -- I told her what had happened and how I didn't have any understanding of what was going on.

And I've actually also filed a report with the police commission where it's if an officer does something, you report it, and then I was told that if they decide to drop the case or whatever, that then the -- then the case would be dropped. I guess I was under the wrong impression, but it's still been over five months that they've responded. And so we've been waiting this whole time for them to even respond back. Also seeing whether or not he is worthy of having this case stand is what I was under the impression, but I don't know.

And like I've said, I've never been contacted whatsoever about my case, and I've just asked for any knowledge or a meeting or anything. And there was only the initial one, and then I was just told that there was an offering. If I plead no contest to assault, that the other two things would be dropped, but I haven't done anything whatsoever, so I -- I was a little bit offended, you know, that I didn't do anything and, you know, my own lawyer is telling me this. So -

THE COURT: Okay. I -- I understand where you're coming -

DEFENDANT HARTER: Because I know no contest, but I've -- I've filed reports with her, with the Court, with the police commission saying what my side is. So no contest is not no contest already because I file -- I've said my side of the story -

THE COURT: I understand.

DEFENDANT HARTER: -- instead of saying no contest and all my stuff gets scratched out. No, I don't want to do that, and I feel -

THE COURT: Any -

DEFENDANT HARTER: -- that it's completely retarded. This case has been going on almost two years. I've never waived the Rule 48. Never. No one ever asked me to waive it, and I never needed it. I've been here every single time on time. There was one where I was like an hour late, and then it was rescheduled. And for that I had a bench warrant, and I was in jail for two months when my court was scheduled one day later. And I never did anything.

THE COURT: And that was August 15th of last year?

DEFENDANT HARTER: Yeah. And the court date was scheduled for like the 18th while I was picked up between that time because I don't know what reason. And it held -- even when I had to go to court when I was in jail, it held that I was picked up for that reason when the court date was already scheduled and they said that that was ignore -- that time that I missed was ignored already.

THE COURT: Okay.

DEFENDANT HARTER: So I've been going through all this stuff. I never did anything in the first place. I called the police because I was assaulted. Then they came, and then they assaulted me also –

THE COURT: Did you do a Rule 48 calculation?

DEFENDANT HARTER: –– while people –– the crowd of people laughed at the police. Not at me. They laughed at the police because they were saying how Waikiki is the streets. And I said no, it's not, sir. This is Waikiki.

THE COURT: Okay.

DEFENDANT HARTER: And then he attacked me.

THE COURT: Mr. Prosecutor –

MR. VAN ACKER: Yes, you Honor.

. . . .

At the close of the August 13, 2012 hearing, the Circuit Court informed Harter that he believed she and Ickes could work together and prepare for trial the next day. He said, "I want both of you – you and your attorney to talk outside, and tomorrow morning at 8:30 I want you guys back here for further status hearing. . . . As of right now, this case is going to trial at 9:30 tomorrow morning."

At the hearing the next morning, August 14, 2012, there was a further discussion:

THE COURT: Ms. Harter, please stand. The Court yesterday ordered you to talk to your attorney as soon as court was completed today –– yesterday.
Did you do so?

DEFENDANT HARTER: No.

THE COURT: Why not?

DEFENDANT HARTER: I didn't hear you say that I needed to talk to my attorney.

THE COURT: I made myself very clear yesterday to you.

DEFENDANT HARTER: I didn't hear it. It was not very clear to me.

THE COURT: Is that the reason why you didn't show up for your arraignment and plea on August 15th last year, because you didn't hear the Court tell you to be there for arraignment and plea?

DEFENDANT HARTER: No. I had called my lawyer and said I would be there but I was running late.

THE COURT: Tone down -- tone down your voice.

DEFENDANT HARTER: I lived in North Shore.

THE COURT: Tone down –

DEFENDANT HARTER: Yes, sir, it is –

THE COURT: -- your voice.

DEFENDANT HARTER: -- it is toned down.

THE COURT: You better lower that volume. Otherwise, you're going to –

DEFENDANT HARTER: I lived in North Shore, and when I was running late, I had called my lawyer. He said don't worry about it. It's rescheduled already for Monday or whatever the next day was.

THE COURT: Well, you -- you better start learning that when the Court says something, the Court means something.

DEFENDANT HARTER: That was over a year ago; correct?

THE COURT: Oh, so that means there's a statute of limitations on things like that?

DEFENDANT HARTER: I don't know what you're saying. I'm just --

THE COURT: Well, that's exactly why you should learn.

DEFENDANT HARTER: -- like I've been attending all these court dates.

THE COURT: I'm telling you to -- to –

DEFENDANT HARTER: And there was supposed to be a Rule 48 –

THE COURT: Don't cut me off.

DEFENDANT HARTER: -- back in November too.

MS. ICKES: You shouldn't interrupt him.

THE COURT: Don't cut me off.

MS. ICKES: He's going to call the sheriff. Don't interrupt him. Don't tell him –

DEFENDANT HARTER: I wasn't interrupting.

THE COURT: Don't ever cut me off.

DEFENDANT HARTER: He was interrupting me.

MS. ICKES: Letitia, I'm –

THE COURT: I was interrupting you?

DEFENDANT HARTER: When I was speaking, you were telling me that I was very loud.

10

THE COURT: I'm talk -- whenever I'm talking, I have the floor.

DEFENDANT HARTER: Okay.

THE COURT: Okay. Now we got each other straight; correct?

DEFENDANT HARTER: Correct.

THE COURT: Okay. Now, when the Court orders you to do something, you do it. I've been notified now by you that you did not· stay around to meet with your attorney.

DEFENDANT HARTER: I went to the Office of Disciplinary Counsel.

THE COURT: I didn't ask you why. I didn't ask you why.
Today, when you arrived, did you talk to your attorney?

DEFENDANT HARTER: Yes.

THE COURT: Okay. And what was the results of that conversation?

DEFENDANT HARTER: I had already pled not guilty, and she wanted to know if I'd change my plea to say no contest, that there would be some kind of deal arranged. But then she said that there would be no way to appeal or address this case in any way, and there's already an investigator on this case from yesterday. And he said it's a hate crime. To get another lawyer because it's a hate crime.

THE COURT: Who said it's a hate crime?

DEFENDANT HARTER: The other investigator because the people -- when all the police showed up and stuff, they were saying that I was a white haole bitch and a tourist, and when -- as soon as I told them that I had lived here for 16 years, that's when the courts actually let me out of jail three days later.

THE COURT: Okay.

DEFENDANT HARTER: Because they thought I was a tourist the whole time.

THE COURT: What's the current status of your employment with your attorney?

DEFENDANT HARTER: I don't know what you're asking.

THE COURT: Well, I can tell you that she has done her homework. She has represented to the Court that she did get the discovery. She has reviewed the discovery.
By the way, the Court will obtain a copy of the police reports and seal it so that any appellate court reviewing this matter will know how small the discovery is, and my guesstimate is that only nine pages of substance are actually typewritten of which it's divided between three witnesses who saw the same thing. And so you're only really

talking about three -- three pages of police report of really true substance about the facts of this case.

I would determine that going over that police report, analyzing it is a matter of an hour, maybe two hours of which the defense attorney has indicated to the Court that it has. Defense attorney on behalf of you declared ready which told the Court that she was ready for trial and able to represent you at trial on June [sic] 16th of this year.

And I know that your sole or the focal point of your -- your position is you cannot work with her because she doesn't return your phone calls. Is -- is that what happened last week, that she didn't return your phone calls, and that's why you're -- you're -- there's been this falling out?

DEFENDANT HARTER: Actually, since the very beginning I had one meeting with her, and every -- at least every month to every two weeks I was giving her a call saying that I needed her to call me. I needed to set up another interview or meeting of some sort. I have papers to give you. If you could give me a call back or send me an e-mail, anything. I never once received a phone call or an e-mail or any of the sort, and I've left messages with her office --

THE COURT: On July 16th, how come you didn't bring that up to the Court?

DEFENDANT HARTER: -- and paperwork I actually had to deliver to her.

THE COURT: My question to you is on July 16th, the last time you appeared, when you heard your attorney declare that you guys were ready for trial, how come you didn't bring that up at that time?

DEFENDANT HARTER: I was never addressed in court. I just would stand here and not say anything this whole time. And now that I've started to say something, I've been threatened with the sheriff.

THE COURT: So you -- so you're -- all of a sudden you're -- you're saying something? I mean, it would have appeared to me that when you appeared to me on February, in April, in May, in -- in July, you should have said something to me at that time.

DEFENDANT HARTER: From April until now, we were still waiting to hear back from the Honolulu Police Commission because my report was never put into the paperwork as part of the police reports, which is what I was trying to do. And it's been 5 1/2 months instead of six weeks, which is -- is as long as it takes.

THE COURT: Well, this case has been hanging around long enough, and I'm not going to let any more cobwebs collect on this case.

Is it your determination that you can work with your attorney?

DEFENDANT HARTER: Well, also before when the -- I guess the Rule 48 was waived, I was never asked if I wanted to waive the Rule 48. Like, again, I was never addressed and asked that question. Just like everybody else has been asked since I've been sitting here all this time, I was never asked if that was okay.

. . . .

THE COURT: This is my options that I'm giving you because at this time your motion to request a new attorney. And I will find that you are a person who is declared an indigent. In other words, you can't afford your attorney. You've been with the public defender's office. And as a result of them -- their withdraw, you have new counsel. And, therefore, as of right now, that's still your status. Your motion was -- was untimely coming yesterday.

The second prong is as to the test given to us by *United States v. John Doe*, which is 272 F.3d 161, 272 F.3d 116, excuse me, Second Circuit, 2001, *USA v. John Doe*. There's factors which this Court must consider. Number 1, whether Defendant made a timely motion requesting new counsel. This is the eve of trial. As of yesterday, in fact, we were scheduled to even do motions in limine.

DEFENDANT HARTER: I never knew --

THE COURT: I find that the motion is untimely. Number two, whether the trial court adequately inquired into the matter. Yesterday I did a searching and probing inquiry into the defendant which has carried over in today.

Number three, whether the conflict between the defendant and her attorney was so great that it resulted in -- in a total lack of communication preventing an adequate defense. That is what I'm trying to find out right now.

DEFENDANT HARTER: Yeah, there was such a lack of communication, I didn't even know it was the eve of trial.

THE COURT: Okay. Well, then the fourth factor is whether the defendant substantially and unjustifiably contributed to the breakdown in the communication, and I also find that. When the Court ordered you to -- to talk to your attorney yesterday, and you walked out of here and kept on going despite the fact that the Court told you to talk to your attorney --

DEFENDANT HARTER: I didn't hear it. I just told you that.

THE COURT: -- and yesterday I told you to be back at 8:30 and you didn't. And now I find out that -- that you were outside with -- with your voice enraged at your attorney. You don't do that.

DEFENDANT HARTER: No, she was yelling at me. I wasn't yelling at her.

THE COURT: It doesn't -- it doesn't matter. When this arguments happen like this, you know, I -- yesterday when you left here, you were responsible for the breakdown, and I think the record is quite clear from my colloquy with you that, you know, a relationship as far as an attorney-client relationship with you you need to understand cannot be one-sided.

Now, your -- the question is whether your attorney is properly prepared to go to trial, which she says she has, whether or not she has done the proper work for you, which she says she has. Is she ample and ready to defend your interest zealously, and I find yes, she has based on not only our conversations in court, but

conversations in chambers where she has fought for your rights in looking at this case.

In this particular case, if you feel that there is good cause to discharge your counsel, I'm obliged to inform you under *State v. Soares*, 81 Hawaii 332, ICA 1996 -- *State v. Soares*, 81 Hawaii 332, ICA 1996, if I find that there's good cause existing for Defendant to discharge her attorney, it should be appoint -- it should appoint substitute counsel.

However, if no valid reason for the discharge appears, and I so find, the trial court should advise the defendant that the Court is not required to appoint substitute counsel to represent the defendant. If after being so advised the defendant continues to demand substitution of another counsel, the trial court may in its discretion discharge counsel and require the defendant to proceed to trial without representation.

Do you understand that?

DEFENDANT HARTER: I was call -- I was speaking to an attorney last night.

THE COURT: That's not my question to you, young lady. Do you understand what I have told you?

DEFENDANT HARTER: Not really.

THE COURT: Okay. Let me break it down for you. If I find that there is good grounds for you to fire your attorney and if I find that there is no valid reason for discharging your attorney, and I'm finding that, I have to advise you that either you're going to keep her, or you're going to proceed to trial this morning by yourself.

DEFENDANT HARTER: I don't wanna go by myself.

THE COURT: Then you are obligated to talk to her.

DEFENDANT HARTER: I was trying to.

THE COURT: Okay. Then I will give you that opportunity.

This Court will be in recess for half an hour. Call downstairs and subject to call, which means that I may call this case earlier.

Counsel for defense, actually I want your -- I want you to be back at -- in -- at your seats in 20 minutes.

MS. ICKES: Yes, Judge.

THE COURT: Okay. You may go outside and confer about this case. If the defendant still wishes to have you represent her, I will keep you. If she doesn't, you're -- I will take the proper steps.

MS. ICKES: Thank you, Judge.

THE COURT: And she will go to trial alone, by herself, without an attorney, but we're going to trial this morning.

Court's in recess.

At the end of the first day of trial, August 14, 2012, after the testimony of the complaining witness, the following dialogue took place on the record:

[COURT:] Let the record reflect the presence of all counsel, Ms. Harter, outside the presence of our jury.

Ms. Harter, I -- I know that you've been talking to your attorney, actively speaking with her about this case and giving her advice or information to try to -- you know, to give her more information during her cross-examination. And -- and I applaud you for that, and I know that you're -- you're zealous in what you're doing. But whenever you stand up, the -- the jury stops listening to what your attorney is saying, and they start looking at you. And so you don't want to distract the jury from what your attorney is trying to accomplish.

And number two, it's important that whatever you tell your attorney is in confidence, and when you speak louder than what is normal, the prosecutors can hear, and you don't want your opponents to hear what you're saying. And so I ask that you tone down -- you know, just have the conversation between you and your attorney. I've been using this white noise to -- to keep -- you know, to at least do the static noise to keep your conversation with your attorney as private as can, but just know that whatever you say, if you say it a little louder than normal, the other side will hear, and you don't want that. Okay.

DEFENDANT HARTER: Yeah.

THE COURT: Okay. Okay. Is there anything else that we need to discuss today?

MR. VAN ACKER: No, your Honor. Thank you.

MS. ICKES: Nothing, your Honor.

THE COURT: Then let's talk about jury instructions. . . . and we're going to start at nine. Yes, ma'am?

DEFENDANT HARTER: I actually believe this is a case of mistaken identity. Like, I was there -

MS. ICKES: We'll talk about it.

DEFENDANT HARTER: -- that night, and there was something that happened. But I don't recognize him, and I don't think he recognizes me. Like honestly, there were police when I was there. He was not one of them. There was an old man who -- with gray hair and a mustache who handcuffed me.

THE COURT: Okay. Well -

DEFENDANT HARTER: But he was not there. It was maybe not even the right time. Like, I don't -- he doesn't really remember anything and -

THE COURT: Okay. Well, he has testified as to one thing, and that's why you need to discuss this matter

with your attorney, especially after court today, because your attorney is -- is your spokesperson in court.

DEFENDANT HARTER: Okay.

THE COURT: And if it's one of mistaken identity and that's the way you want to talk, you know, as far as what you're thinking, that's why I'm glad that you're talking to your attorney and letting her know of these potential issues. Okay?

DEFENDANT HARTER: Okay.

On appeal, Harter also points to her own August 14, 2012 trial testimony as indicating a need for an inquiry into her competence.  Her testimony included the following excerpts:

Q. (BY MS. ICKES) What happened after you got the job application?

A. I went back in. And Chris was sitting at the first stage still, and somebody had taken my chair. So right to the right of the entrance, there's stairs in front of the bathrooms, and there's a whole bunch of chairs. So I went to go grab one. And there's actually a pole holding the stairs up off the stages, and I stood and I leaned on the pole. And I was looking at all three stages in front of me seeing, like, oh, my goodness. This is where I'm going to work. And --

. . . .

Q. (BY MS. ICKES) You're standing at the pole. What happens?

A. As I'm reaching -- or then I'm reaching down to grab a chair, and a guy comes walking over from across the back of the bar. Well, the guy is a bouncer. And -

. . . .

Q. (BY MS. ICKES) The bouncer gets to you?

A. And he says -

Q. Not what he says.

A. Oh.

Q. But what happens when the bouncer gets to you?

A. He -- he starts a conversation, and he wants me to move away from the pole on the ground.

Q. Okay.

A. And I said, okay, yeah, I'm going to sit down with my boyfriend, I'm grabbing a chair. And as I do that, he puts his hand on my back. He's -- he pats my back and says, you do that. Okay? And I tell him, oh, it hurts when you do that. Like I'm not trying to be very mean, but he's like seven feet tall and 500 pounds, hitting a skinny girl. It hurt to my fingertips and my toes, and I was just like, ah, like it was crippling pain just him patting my back.

Q. Okay. Did he touch you in any other way?

A. Yes. After I told him that it hurt me, he did it again as I was bending over to grab a chair, and I said, please get off of me. Well, he grabs both of my wrists, and instead of moving my body how it's supposed to move, he just does it, and he dangles me like this, dangles me, and calls me a whore and –

Q. (Indiscernible.)

A. –– starts shouting at me.

Q. Ms. Harter, not –– I'm not interested in what he says.

A. Oh.

Q. Just what –– how he –– how he touched you. And for the record, just so the record is clear, he had both your right and left arms directly above your head with the –– the ––

A. He was –

Q. –– (indiscernible).

A. –– holding me with one hand.

Q. Okay. Because this is recorded, so the recorder can't see your motion. So just for the record. Now, after this –

MR. VAN ACKER: And I'm sorry to interrupt. Your Honor, if the Court could just please note a running objection on behalf of the State as to relevance.

THE WITNESS: The sex assault?

THE COURT: No, at this time, I'm going to want you to object from here on in.

MR. VAN ACKER: The State will object.

THE COURT: Thank you. Now with that clarification, let's move on to the next question.

Q. (BY MS. ICKES) What did you do after the bouncer did that?

A. Then he was pushing me into the lobby, and when I got to the lobby, I asked to speak to a manager, because I had just grabbed a job application. I didn't even get to sit back down. And I was very hurt, because I wanted a job.

Q. Okay.

A. And I asked to speak to someone in charge.

Q. Okay. Now, at some point, you called 911; right?

A. Yes, ma'am.

Q. And this was because the bouncer touched you

A. And I was --

Q. -- on your back?

A. -- not allowed to speak to someone in charge that night.

Q. So you called 911?

A. Yes, ma'am.

(Some of State's objections omitted.)

Harter's direct testimony regarding her encounter with the police appeared, at some points, to be confused.

Q. Okay. Now, did you feel like HPD didn't help you when they first got there?

A. Yes. The first officer came up and spoke to me, and he introduced himself, and I introduced myself. And then somebody comes out from the club and goes right up to us, instead of one of the seven -- other seven officers, comes right up to us, and he doesn't even excuse himself, goes into the club with that somebody. And then that happens three more times. So as -- four officers come up. He was the only one to introduce himself. The other three, somebody comes out from the club, and he leaves. And then the next guy comes up. Somebody comes out from the club, and he just leaves without excusing himself.

Q. Okay. So –

MR. VAN ACKER: Your Honor, the State is going to object as to the vague response here.

THE COURT: Objection is sustained. Responses are vague and ambiguous.

THE WITNESS: Because I said "somebody"?

Q. (BY MS. ICKES) Just listen. I'll ask questions and you –

A. Yes.

Q. -- just respond to my questions.

THE COURT: Okay. We're –

Q. (BY MS. ICKES) If the judge says "sustained" or if there's an objection, you stop talking. Okay?
. . . .

Q. Was that Officer Uno who took your ID card?

A. No. It was an old man with gray hair and a gray mustache, who's very short.

Q. Okay.

A. And old.

Q. Did you push Officer Gonzales?

A. No. I didn't touch anybody that night.

Q. My specific question is: Did you push Officer Gonzales?

A. No. I've never seen him before.

. . . .

. . . . So I'm face down on the ground with two officers on each arm. And then the officer's behind me, and he's saying, give me your right arm, give me your right arm. And I can't because there's a grown man on my arm.

Q. Did they eventually pull your arms behind your back?

A. They -- no. He was saying, stop resisting arrest, stop resisting arrest. And so the guy gets up and hands him my right arm. And he says, give me your left arm, and he starts laughing. He's laughing that I'm resisting, because somebody is holding me down, and I cannot move, who is an officer. And so I move my arm and get it into handcuffs.

By this time, my shirt is completely off. My pants are falling down. And I'm -- I have my clothes on underneath, but I was completely exposed in front of 40-plus people in front of 939.

Q. Okay. Ms. Harter, so -

A. By the time I had handcuffs.

Q. -- your arms get pulled -- eventually get pulled behind your back?

A. Yes, ma'am.

Q. At this point, are you on your knees or are you flat on the ground?

A. Flat on the ground.

On cross-examination:

Q. [MR. VAN ACKER] Has your height changed between May 1st, 2011, and today?

A. Possibly. I think -- I think I might be shorter, because my calves are -- have been in pain and my feet, too, so . . .

Q. So you shrunk?

A. I -- probably. My muscles are contracted instead of relaxed, so it puts pressure on my height and my bones and stuff.

Q. Okay. So you've gotten -- so yes or no, you've gotten shorter?

A. Yes.

. . . .

Q. Now, this person you said pats you on the back; right?

A. Yes.

Q. And you felt crippling pain; right?

A. Yes, sir.

Q. You were extremely hurt; right?

A. Yes. I had never -- I hadn't been touched for about six months because I had just gotten out of engagement, and I didn't -- I especially didn't feel pain, so I didn't know how extreme someone just doing that was. I was in shock because of how bad it hurt too.

. . . .

Q. And so you counted the number of -- of officers, right, that showed up?

A. Yes, sir.

Q. But none of the officers that testified here today, except for maybe Officer Uno, were the officers that were at the scene; right?

A. Correct.

Q. So these guys were just -

A. Stand-ins -

Q. -- showing up -

A. -- or something, yeah.

Q. Okay. So they're just -

A. I've never seen. Especially the first two officers, I hadn't seen them before.

Q. Okay.

A. I can pretty much describe almost every officer who was there, and there's a possibility that Mr. Uno was there, but inside of the club -

Q. But the other three officers -

A. Oh, no, no -- Bir -- Bir -- I think it was Mr. Uno.

Q. Birgado?

A. No, it -- Mr. Birgado and Gonzales were -- I hadn't seen them before.

Q. And so what you're saying today is they're stand-ins; right? That's what you said?

A. Either that or they have the case confused with another incident that happened, 'cause I know that there's something within the week with another girl.

. . . .

NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

Q. And how were you behaving prior to arrest?

A. Prior to arrest, I was standing, and I actually had another officer, the old man, and he was talking to me, and he was -- wanted to see how I talked, and he was very -- like kind of looked, like, just adoring, like, looking at me, I want to say. I don't know how to explain it, like -- because I was out with a pro surfer that night. It was like our first -- one of our first nights out, and I was getting a job, like I was pretty well-behaved. And, like, I don't believe in hurting someone or anything like that. So . . .

Q. Okay.

A. I used to have a daycare. And –

Q. Okay.

A. -- I was a business lady.

MR. VAN ACKER: Objection. Nonresponsive again.

THE COURT: Okay.

THE WITNESS: How was I behaving?

THE COURT: Hang on. The objection is sustained. The answer is nonresponsive.
. . . .

Q. And so the police placed you under arrest while you were doing nothing; correct?

A. No, because they -- there was a conversation between one of the officers, and after -- he said, oh, I'm charging you with disorderly conduct, and I said, but I haven't done anything disorderly. And he was like, I'm charging you with disorderly conduct. And I said, you can't. And he said, I can do whatever I want. We run these streets. And –

MR. VAN ACKER: Objection. Hearsay objection. Nonresponsive.

A. -- so I said, Waikiki is not the streets. It's one of the top ten tourist destinations of the world. And at that point, the crowd gets up -- riled up, like, yeah, and they start cheering. And so he feels that there's -- they -- they're starting to put themselves and separate the officer from me, because for ten minutes of this conversation, he was walking around me in a circle and talking to me and seeing, like, what I would say and how I was responding to it.

Q. (BY MR. VAN ACKER) Who was doing this?

A. It was the old officer with the gray hair --

Q. Okay. So one of the --

A. -- and the mustache. None of the officers here.

Q. Okay. So please just listen to my questions and answer them. Okay?

A. Okay.

. . . .

After she was found guilty as charged, Harter failed to show up for her initially-scheduled sentencing hearing. At the continued hearing for sentencing, and a defense motion for judgment notwithstanding the verdict, the prosecutor summarized the trial testimony including that, on the night of her arrest, Harter was "raging out of control" and that a "large crowd gathered around as a result of this out-of-control behavior. The language was abusive -- beyond abusive, really." On several occasions during the hearing, Harter interrupted the prosecutor, as well as her own lawyer. At sentencing, for the first time, defense counsel suggested that Harter might respond to "a special condition that she obtain and complete mental health treatment."

When offered an opportunity to address the court, Harter stated:

> THE DEFENDANT: Well, yeah, I also had written a letter that I used to have like $20 million, and I just lost my family and my fiancé. And during this, I had lost three businesses, I believe, because I had to stop and participate in the case and the things that I had to stop doing for my businesses.
>
> And, yeah, I think that there's definitely been a lot of stress. I would like to get some mental health done. But I don't think that I need to be in captivity anymore, because I've -- I always do everything that I think is right. And this was definitely -
>
> THE COURT: Including not showing up for Court --
>
> THE DEFENDANT: -- a misunderstanding. I'm trying to get -
>
> THE COURT: -- when I tell you to show up the next morning? What happened?
>
> THE DEFENDANT: I was actually -- had to go and I was talking to investigators. And that's what happened. I just -- I was talking with -- started talking with the FBI and other investigators, also, with the case. And I had to miss meetings because of the apprehension on Pearl Harbor, because somebody stole my phone. It was Pearl Harbor, not Hickam. But I know they're joint bases.
>
> And the only reason why he said that is because I told him that I was going to go speak to the commander of the base, because he's my friend. And he got freaked out that I was going to tell on the police officer. And I was like, why would I talk about him?

But -- yeah, so I was -- I -- I don't disagree with going to get checked out, because there has been a lot of stuff that I've been through, and this has just put so much stress on me. But I'm fully capable of working. I'm nice. I get along with everybody, usually. And it's just hard to hear things about me that didn't happen.

And like I said, those three guys, I never recognized any of them. And my boyfriend, whose dad is a Supreme Court justice, he was -- he -- his statement said that the police officer said he was -- he hurt his chin a week earlier from a different girl. But he wasn't here to testify. And I have drink records that prove I didn't drink that night.

And there's so much more evidence that can be brought. That's why I really want to appeal. And I wouldn't be able to do that if I was in jail for a year. I'm the only one who has my stuff, and it's in storage. And I could lose everything, you know. And I feel like what's already happened to me, and it doesn't need to keep happening to me.

THE COURT: Is there anything else you think I should know? Because you still haven't answered my question.

THE DEFENDANT: What was your question?

THE COURT: How come you didn't show up for sentencing the next day?

THE DEFENDANT: Because I felt that I didn't need to be sentenced, that it was so absurd that everything that I went through, I never even got to finish my statement. I -- and the three guys weren't even there the night that I was there. It was a completely mistaken identity.

I -- so I was going to show up, but I was so freaked out, like I went and -- I was -- I even got ready for court and everything, and I just couldn't do it, like I thought it was so crazy. And I was terrified that something bad was going to happen to me.

Because even the judge before at District Court was threatening me when I just walked in, before I even -- we never even had trial. It was just the first preliminary where I met my public defender and everything. And he, like, screamed over everybody that was in the court and said, I'm going to fry you, da, da, da. I'm pushing it to the limit. You're going to be in jail for three years, da, da, da. And I was like, I'm -- I'm going to go to trial, because this is so crazy.

So I've been so freaked out because of all of this. And everyone's been so rough on me, when I tried to get help because I was sexually assaulted, and my -- it was a foot and a half away from my boyfriend the whole time.

And then they -- they -- the police had -- got my Alabama ID when I called, and they're like, ho, she's not even from Hawaii, like, we're this -- they even said they're a gang, like they're doing all this stuff to me.

And then when they found out that I was from Hawaii, then I was out last time in three days. So they thought that I was a tourist this whole time. That's -- that was, like, their goal. And they thought I was a rich tourist, which turned out, no, I'm somebody who's local.

I'm trying to do everything. I've been trying to go to -- I want to go to school and have that done by Christmas. And like I said, I already have plans to be a missionary, and anyone would -- could vouch for that, I guess. But . . .

23

THE COURT: Okay. Anything –

THE DEFENDANT: I'm real -- I'm really sorry I didn't show up. I don't know what to say. I don't believe that there's an answer, but I just don't believe that it's fit at all.

THE COURT: Okay. Thank you very much.

After the Circuit Court sentenced Harter to, *inter alia*, one year in jail, mittimus forthwith, and Ickes renewed her motion to withdraw as counsel, the hearing closed with:

THE COURT: Is that true? You wish to pursue an appeal?

THE DEFENDANT: Yes, sir. And –

THE COURT: Okay. Your motion is granted, then. A new attorney will be appointed for her.

MS. ICKES: Thank you.

THE DEFENDANT: I have questions. So do I have jail time to serve?

THE COURT: Your new attorney will -- will discuss that with you.
This matter's concluded.

THE DEFENDANT: I also wanted to –

THE LAW CLERK: All rise.

THE DEFENDANT: -- ask to go to state hospital, sir.

THE LAW CLERK: Court is in recess.

As discussed above, the Hawai'i Supreme Court has observed that "only some rational basis for convening a panel is necessary to trigger the [trial] court's . . . power to stay the proceedings and, thereafter, to appoint examiners." Castro III, 93 Hawai'i at 427, 5 P.3d at 417 (internal quotation marks omitted). Where there is a rational basis to doubt a defendant's fitness to proceed and to believe defendant is suffering from a physical or mental disease, disorder, or defect that had affected his ability to assist in his own defense, the court must *sua sponte* order a competency hearing. Castro I, 93 Hawai'i at 462, 5 P.3d at 452. Where a question of fitness to stand trial *is raised*, it is best resolved at the pretrial stage because

24

> [s]uch a practice removes from trial the concern that incapacity which is not readily apparent to lay observation will surface during trial proceedings or, much worse, after trial has ended. Obviously, if a defendant is found fit to proceed based upon expert testimony in the record, the question of whether an examination should have been judicially ordered or not is largely removed from judicial re-examination.

Castro I, 93 Hawaiʻi at 462, 5 P.3d at 452.

In this case, however, the question was not raised before or during trial. Unlike many cases where fitness is an issue, there is no information in the record confirming whether or not Harter has a history and/or diagnosis of mental disease, disorder, or defect. As noted above, Harter's counsel did not raise any concern about Harter's ability to participate in her defense based on competence, but Ickes did argue that substitute counsel should be appointed because Harter did not trust her, and candidly admitted she had only met with her client privately once, for about an hour. By the time of sentencing, however, there apparently was sufficient indication of a potential problem for defense counsel to suggest mental health evaluation and treatment as part of Harter's sentence. No record was made as to the reason for that suggestion.

The transcripts give us a glimpse of Harter's conduct and demeanor, without the benefit of the trial court's ability to observe her actions, expressions, voice tone, volume, and inflection, body language, and/or the myriad of other bits of information that could contribute to the court's unprompted impressions concerning whether or not there was, at any time during the proceedings, a rational basis to doubt Harter's fitness to proceed. The record reflects a mixed bag of appropriate behavior, where Harter appears to sometimes understand even fine nuances and details of the proceedings, and inappropriate, irrational, and potentially self-defeating – and perhaps delusional – behavior and statements.

Examples of the latter are seen at the time of DPD Bassett's withdrawal, where Harter stated that he was her seventh DPD, that she had a new job as an MTV casting director, that Bassett said she is crazy and "tried to put [her] down." There

could be some factual basis to these statements, they could reflect mere hyperbole or a sense of drama, or they could be early indications that Harter might be mentally impaired.

Harter's conduct on the eve of trial followed in this vein.  Her statements to the court were somewhat incoherent, but reflected her potentially legitimate concerns about her case. Her rambling on about "no contest" and "Rule 48" and the "crowd of people" that "laughed at the police" were seemingly out-of-context and possibly irrational given that the issue was whether a further withdrawal substitution of counsel would be allowed. On the other hand, "agitated behavior or verbose, rambling, and inappropriate remarks do not automatically raise doubts as to the defendant's competence to stand trial."  Soares, 81 Hawai'i at 350, 916 P.2d at 1251.

The start of the pre-trial the next morning is also open to differing interpretations.  Harter's overly loud and argumentative posture with the court might simply reflect poor behavior, resentment, and/or a rational fear of going to trial. Or, they could be construed as part of a mental health problem. Likewise, Harter's statements such as that "there's already an investigator on this case from yesterday [a]nd he said it's a hate crime" seem to evidence a disassociation from the actual events taking place at that time, but might have had some basis in reality.  Harter's claim not to have heard the judge order her to consult with her lawyer, and her apparent refusal to discuss the case with her lawyer (instead reportedly "outside with [] your voice enraged at your lawyer"), might simply have been obstinance or willful defiance of the court's instruction.  Or, it might have been an indication of a mental health issue.  On the other hand, she was observed by the court to working with her lawyer during voir dire.

More troubling, perhaps, is Harter's apparently inappropriate conduct before the jury, which the court described as standing up during the proceedings, and speaking louder than normal to her attorney, so that the prosecutor could hear, and the jury was distracted.  On the other hand, that behavior might

simply reflect poor self-awareness or poor judgment about her conduct. Similarly, Harter's unprompted statements at the end of the day about mistaken identity, and her assertions that the complaining witness was not present at the time of her arrest, might have simply been an inappropriate attempt to argue her case.

Finally, Harter's testimony concerning her encounter with the bouncer could be construed as evidencing her disconnection with reality, a mere tendency to exaggerate,[5] or an unskillful attempt to lie her way out of a conviction. Her vagueness, to the point of incoherence, would be unremarkable in isolation. Her stance that she had never seen the complaining witness before, that he was a "stand-in", or confused her with another girl, could be viewed as simply an unsuccessful attempt to create reasonable doubt or reflective of a state of inebriation or intoxication at the time of her encounter with the police.[6] Her statement that her height had changed since the time of her arrest because her muscles were "contract instead of relaxed" might be indicative of nothing more than an argumentative response to the prosecutor's inquiry. In response to the prosecutor's inquiry, her exaggerated explanation of the shocking pain caused by the bouncer might simply have been an attempt to elicit sympathy. Her other seemingly irrational and nonresponsive interjections of testimony about formerly having a daycare and having been a business lady might have been intended to bolster her image, but seemed odd at least.

Finally, although the trial was over, Harter's rambling statement at sentencing - including wild assertions about having had $20 million dollars, losing her family and fiancé, losing three businesses, and dating the son of a supreme court justice - could simply have reflected feeble attempts at avoiding imprisonment. Likewise, Harter's apparent lack of understanding

---

[5] On cross-examination, she volunteered that her description of the bouncer was an exaggeration.

[6] Two officers testified that Harter smelled of alcohol and had glassy and watery eyes, which they associated with intoxication.

of her sentence could have been feigned or reflective of self-denial. However, it also could have been indicative of compromised mental health, which she alluded to when she said she "would like to get some mental health done" and asked to go to the state hospital.

On the record before us, we cannot conclude that the Circuit Court plainly erred in failing to *sua sponte* hold a competency hearing. Nevertheless, we will affirm Harter's conviction without prejudice to her raising and further developing the issue of her fitness to stand trial in a petition for post-conviction relief filed pursuant to HRPP Rule 40. In addition, Harter shall not be foreclosed from raising this issue or issues stemming from HRS § 704-402(1), which affords an affirmative defense for "physical or mental disease, disorder, or defect excluding responsibility," in conjunction with her ineffective assistance of counsel contentions. <u>See</u>, <u>e.g.</u>, <u>Tierney</u>, 127 Hawai'i at 173, 277 P.3d at 267.

(3) Harter's argument that she received ineffective assistance of counsel is denied without prejudice to her raising it in a petition for post-conviction relief filed pursuant to HRPP Rule 40, as the competency issue may also have bearing on Harter's apparent intoxication.

For these reasons, the Circuit Court's October 11, 2012 Judgment of Conviction and Sentence is affirmed, without prejudice to the filing of an HRPP Rule 40 petition, as discussed above.

DATED: Honolulu, Hawai'i, January 28, 2014.

On the briefs:

Alen M. Kaneshiro
for Defendant-Appellant

James M. Anderson
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge

28